IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JOHN M. HIGGINS, CAROL HIGGINS, and WEATHERGUARD, INC., | Case No. 8:17-cv-_____ |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| KENTUCKY SPORTS RADIO LLC, MATTHEW H. JONES, and DREW FRANKLIN, | **JURY DEMAND** |
| Defendants. | |

Plaintiffs John M. Higgins, Carol Higgins, and Weatherguard, Inc. ("Plaintiffs"), by and through their counsel of record, pursuant to Rules 3, 7(a) and 8(a) of the Federal Rules of Civil Procedure, commence this action by filing this Complaint against Kentucky Sports Radio LLC, Matthew H. Jones, and Drew Franklin ("Defendants") and state and allege as follows:

College sports is big business, and college basketball fans are notorious for their ferocious devotion to the home team. While a basketball game is only played between two teams, there are three major groups of players at each game: the winning team, the losing team, and, increasingly visible with instant-replay on every television broadcast, the referees. Ideally, the fans of the losing team would clinically analyze the game and hope for a better day tomorrow (or next season). Realistically, some, instead, inappropriately blame and ridicule the collegiate players. Others choose to excoriate the referees. A critique or two, with lively language, is to be expected. Death threats and defamatory messages in the thousands that lead to a serious

disruption in a referee's business are not to be expected, are tortious, and are to be met with the full force of the civil action and the penalties awarded thereunder.

## THE PARTIES

1.     Mr. Higgins is an individual and a citizen of the State of Nebraska.

2.     Ms. Higgins is an individual and a citizen of the State of Nebraska.

3.     Weatherguard, Inc. ("Weatherguard") is a Nebraska corporation with its principal place of business in Sarpy County, Nebraska.

4.     Upon information and belief, defendant Kentucky Sports Radio LLC ("KSR") is a limited liability company organized in the State of Kentucky, whose member/managers, Matthew H. Jones and Andrew S. Jefferson, are both citizens of the State of Kentucky.

5.     Upon information and belief, defendant Matthew H. Jones is a citizen of the State of Kentucky and the founder, organizer, and a member/manager of KSR.

6.     Upon information and belief, defendant Drew Franklin is a citizen of the State of Kentucky and the managing editor for KSR.

## JURISDICTION AND VENUE

7.     This Court may exercise subject matter jurisdiction over the claims set forth in this Complaint because "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."  28 U.S.C. § 1332(a)(1).

8.     This Court may exercise personal jurisdiction over Defendants based upon their presence within this judicial district, as described below.  *See* Neb. Rev. Stat. § 25-536(1)(c), (d) ("A court may exercise personal jurisdiction over a person [w]ho acts directly or by an agent, as to a cause of action arising from the person [c]ausing tortious injury by an act or omission in this

2

state" or "[c]ausing tortious injury in this state by an act or omission outside this state if the person . . . engages in any other persistent course of conduct . . . in this state."). Through the actions described below, Defendants have sufficient contact and relations with the State of Nebraska "to afford a basis for the exercise of personal jurisdiction consistent with the Constitution of the United States." Neb. Rev. Stat. § 25-536(2).

9.     Venue in this Court is proper because "a substantial part of the events or omissions giving rise to the claim occurred" in this judicial district, as described below. 28 U.S.C. § 1391(b)(2).

## STATEMENT OF FACTS

### Mr. and Ms. Higgins and Weatherguard

10.     Mr. Higgins is the President and co-owner of Weatherguard, a commercial and residential roofing, siding, and gutter contractor headquartered in Sarpy County, Nebraska. Mr. Higgins has been providing quality roofing services to the citizens of the State of Nebraska since 1984.

11.     Ms. Higgins is the Vice-President, Secretary, Treasurer, and co-owner of Weatherguard. In her capacity as an officer and employee, Ms. Higgins provides administrative, financial, and accounting services to Weatherguard.

12.     Weatherguard has been an accredited business with the Better Business Bureau since 1996 and enjoys an A+ rating from the same.

13.     Mr. Higgins registered Weatherguard as a Nebraska corporation in 1997.

14.     Mr. and Ms. Higgins are the only directors of Weatherguard.

15.     Mr. and Ms. Higgins are married.

4829-6808-9166.2

16.     Weatherguard's website address is www.roferees.com.  This is not merely a play on words—it refers to the fact that Mr. Higgins has served as a top-notch referee for NCAA men's basketball games since 1988.  Mr. Higgins has officiated at numerous NCAA tournament ("March Madness") basketball games, including eight Final Four games and the 2013 and 2016 championship games.  Mr. Higgins often officiates at more than 90 NCAA games in a season.

17.     In January 2016, Sports Illustrated featured a major, complimentary profile of Mr. Higgins, calling him "one of the nation's most visible, wanted—and loathed—basketball referees."  Sports Illustrated stated, "Much of the teasing is done in good humor . . . but some of it is not."  https://www.si.com/college-basketball/2016/01/28/ncaa-basketballs-most-recognized-referee-well-traveled-john-higgins#.

**Kentucky Sports Radio and the Show**

18.     Kentucky Sports Radio can be heard worldwide, and throughout the state of Nebraska, as a podcast over the internet radio platform iHeartRadio and on iTunes, SoundCloud, and other online media sites.

19.     Mr. Jones is the host of a two-hour radio call-in show on KSR (the "Show"), which is broadcast to more than 40 radio stations in Kentucky and elsewhere and is also universally available online, as noted.

20.     KSR also maintains a website, Kentuckysportsradio.com, that promises "University of Kentucky Basketball, Football, and Recruiting news brought to you in the most ridiculous manner possible."   Mr. Jones maintains a blog on Kentuckysportsradio.com.  Mr. Franklin is a frequent contributor to the website, as well.

21.     University of Kentucky men's basketball coach John Calipari is a frequent guest on the Show.  Mr. Jones credits Coach Calipari as a large part of KSR's success.

**The 2017 North Carolina vs. Kentucky Game**

22.     During the 2017 NCAA basketball tournament, on Sunday, March 26, 2017, Mr. Higgins officiated the "Elite Eight" game between the University of North Carolina Tar Heels and the University of Kentucky Wildcats (the "Game").  North Carolina won the Game by a score of 75 to 73, on a last second buzzer-beater jump shot.  Mr. Higgins was part of a three-referee officiating team.

23.     During the Game, Kentucky received 19 fouls, including two each in the first half for three major players.  North Carolina received 18 fouls.

24.     That same day, after the Game, Coach Calipari directly criticized the officiating at the Game during his postgame news conference, beginning the conference by stating, "You know, it's amazing that we were in that game where they practically fouled out my team. Amazing that we had a chance."

**KSR's Response to the Game**

25.     Immediately after the game, Mr. Higgins was already under attack at KSR. During the "UK Post-Game Show," Mr. Jones stated,

> I do think the officiating the first half was putrid.  And John Higgins has been a part of some of Kentucky's most painful losses.  And I can tell you, I was sitting behind Cal's [Coach Calipari's] bench . . . UK bench for the first half, . . . and Cal was not a happy camper with Higgins, with Higgins especially.  I get the feeling that that is not one of his favorite people and, you know, you heard in the post-game press conference, Cal said he thought they kind of got jobbed in the officiating in fouls. And that is something he does not say—I don't know that I've ever heard him say it—so you could tell he meant it.

26.     On Monday, March 27, 2017, a short video, titled "John Higgins Sabotage of Kentucky" (the "Video"), appeared on fan forums on the internet, including KentuckyCrazies.com, as well as on the website vimeo.com.  The Video was posted by "Cal For The Win," and started with Coach Calipari's post-game remarks.  It also showed footage of the

Game with Kentucky announcers discussing many of the called fouls.  At the end of the Video, a photo of Mr. Higgins next to a Weatherguard truck appeared.  Next to the photo were Weatherguard's business phone number, its website address, and the Higgins family home phone number.  Beneath the photo and contact information was the following:  "Write a review of him here http:/www.facebook.com/rooferees."

27.     The day after the Game, Monday, March 27, 2017, on the two-hour KSR Show starting at 10:00 a.m. Eastern time, Mr. Jones frequently discussed Mr. Higgins.  While reading emails from listeners, Mr. Jones purposely and intentionally read an email from "Anthony," who stated, "I'm thinking of leaving a bad review on John Higgins' roofing Yelp page."  Mr. Jones commented that he saw people posting Mr. Higgins' business card, as well.  Mr. Jones insisted that he claimed that this was a bad thing to do, because it would constitute "harassment."  Throughout the Show, comments were made about the officiating at the Game and about Mr. Higgins in particular.

28.     Later in the Show, Mr. Jones purposely and intentionally read another email that stated, "I was against trolling John Higgins.  Then I went and saw the name of his roofing company."  Mr. Jones said to his sidekick, "Oh my goodness, you know what his roofing company name is? . . .  Rooferees.  [Laugher.] . . . Seriously.  The name of his company is rooferees.com.  [Laughter]. R-O-O-F-E-R-E-E-S.com.  Rooferees.   Now I still don't think you should troll the guy but now I have less sympathy if his name is Rooferees."   On the one hand, Mr. Jones would have his listeners believe he was against "troll[ing] the guy"; on the other hand, Mr. Jones helpfully *spelled out the website address* of Rooferees.com.

29.     That same day, Monday, March 27, 2017, KSR published several articles on Kentuckysportsradio.com about Mr. Higgins.  For example, at 11:00 p.m., Mr. Franklin posted

an article called, "No more John Higgins please."   http://kentuckysportsradio.com/basketball-2/no-more-john-higgins-please/.   After outlining what he saw as Mr. Higgins' officiating mistakes at the Game, Mr. Franklin quoted Coach Calipari:  "All of it led John Calipari to say in his press conference, 'You know, it's amazing that we were in that game where they practically fouled out my whole team. Amazing that we had a chance.'  Cal also said he wishes he had his full roster in the first half against the Tar Heels. . . .  Going forward, obviously, John Higgins should be kept far, far away from meaningful Kentucky games. I'm sure Calipari will do everything he can to make that happen."  The photo at the top of the blog was as follows:



30.

31.     One of the comments to the article, from "Gunslinger," commenter # 7, reads as follows:  "Hey, thanks for the target….just print it out and fire away."

> *GUNSLINGER* March 27, 2017 at 8:06 pm | Permalink
> Hey, thanks for the target….just print it out and fire away.

32.     CalForTheWin, commenter # 21, posted as follows:  "Here is a video compilation of all the bad calls for anyone interested.  https://vimeo.com/210359968."

7

> *CalForTheWin* March 27, 2017 at 10:04 pm | Permalink
> Here is a video compilation of all the bad calls for anyone interested.
> https://vimeo.com/210359968

33.    [The vimeo.com link no longer leads to an active video.  In addition, although "John Higgins Sabotage of Kentucky" appears as a suggestion when "John Higgins" is typed into the Vimeo search bar, that link also goes nowhere now.]

34.    Commenter # 26, Adam, posted, "http://www.rooferees.com/about-us/  Can we get a gofundme to put this guy on blast in Omaha?!?"

> *Adam* March 27, 2017 at 11:00 pm | Permalink
> http://www.rooferees.com/about-us/
> Can we get a gofundme to put this guy on blast in Omaha?!?

35.    Commenter # 27, bradbcats, posted, "I put a link to this post on his website. http://www.rooferees.com."

> *bradbcats* March 27, 2017 at 11:28 pm | Permalink
> I put a link to this post on his website.
> http://www.rooferees.com

36.    bluetide responded, "Well done.  Keep fighting the good fight."  Adam responded, "Awesome.  Dude is trash."

37.    The next day, Tuesday, March 28, 2017, 9:00 a.m., Mr. Franklin posted an article titled "Barleycorn's Tuesday Top 10" at http://kentuckysportsradio.com/main/barleycorns-top-10.  Mr. Franklin wrote, "**John Higgins' business is getting CRUSHED on its Facebook page**. I won't link the page because I don't completely agree with attacking his side hustle, but, man, Big Blue Nation is destroying Higgins in the comments and reviews of the business."  Mr. Franklin self-servingly claimed "I won't link the page" *at the same time that the Rooferees/Weatherguard business page was actively linked* on the comments section to his very

post from the night before, and the Rooferees/Weatherguard Facebook homepage link was available on the Video, also linked in the comments section.

38.     Not being able to restrain himself, Mr. Franklin continued, "If you can stand to watch it, here you go…   [now-inactive link to https://vimeo.com/210359968]   John Higgins Sabotage of Kentucky from cal for the win on Vimeo," again "link[ing] the page" for the Rooferees/Weatherguard Facebook homepage through the Video.

39.     Mr. Franklin concluded, "Let's have a fun day to get over March Sadness.  Join us for KSR radio at 10 and here on the site all day long…"

40.     Commenter # 1 to the "Barleycorn's Tuesday" article wrote,

*runningunnin.454* March 28, 2017 at 9:12 am | Permalink

John Higgins' business can crash and burn…he is corrupt to the core.
And while Cal is at the Final Four, if anybody wants an interview, Cal should blast the guy to hell nation wide. Any fair minded neutral basketball fan knows how that went down.

41.     Commenter # 2 wrote,

*ukjaybrat* March 28, 2017 at 9:34 am | Permalink

I don't know what he rating was before. but on facebook it's down to 1.1 stars
lmao.

I won't attack his personal life because i think it's wrong. but i can't say i don't find it absolutely hilarious.

42.     An hour later, at 9:58 a.m., just before air time for the Show at 10:00, Mr. Franklin posted a new article called "Talkin' Higgins, a new basketball target and more (Tuesday Show Thread)" at http://kentuckysportsradio.com/main/talkin-higgins-a-new-basketball-target-and-more-tuesday-show-thread/, saying:

It's a busy day on KSR as Matt and Ryan introduce you to a new target on Calipari's big board and continue the hatred for John Higgins.

They'll have that and more on two hours of Tuesday morning KSR.

9

**Join in on the fun by calling (502) 571-1080.**

43.    Also on March 28th, 2017, at 10:00 a.m., Mr. Franklin posted an article called

"Kentucky fans are really lighting up John Higgins' roofing business," at

http://kentuckysportsradio.com/basketball-2/kentucky-fans-are-really-lighting-up-john-higgins-

roofing-business/.  The article, reproduced here in full, enjoys extensively quoting fan comments

on Weatherguard's Facebook page while pretending to condemn the same:

We here at Kentucky-Sports-Radio-dot-com do not condone the activity from Big Blue
Nation on John Higgins' roofing company's Facebook page.

But like Big Blue Nation, we are still upset over some of Higgins' calls in the UK-UNC game,
so we can and we will *read* the activity on the Facebook page.

Some examples:

John pooped on my roof. instead of shingles, John pooped on my roof.

John personally came out to fix my roof. Ill say this guy was very professional, he hit on my 13 year old son and clogged my toilet and didnt tell anyone. I tried to get him to come back and finish my roof. he agreed to come back the following day. when he finally showed up 3 hours late he smelled like tequila and strippers. his attire for the day was glitter and a tank top. i personally have never dealt with such a simple minded person. when my roof was finally "fixed" he over charged me and even tried to put his tequila and stripper bill on my bill.

10

Not sure if you can do roofing, but please take 15 minutes and watch your calls in the first half of the NC/UK game. I hope you roof better than you ref. You do realize that NC gives grades for non-existent classes. And instead of rigging the game against the biggest joke in all of college sports NC! you go after a bunch of kids who are good kids, just so talented they don't have to stick around and play college ball with crappy creating refs. Next time you rig a game, do it for the good people and not the academic cheating program. Actually don't watch your calls, have your best friends watch your calls and have them tell you how you did.

You should never be allowed to officiate a collegiate basketball game again. Such sheer and utter disregard for the game of basketball. You influenced the game and made it about yourself the first half. I'm not going to sit here and say your officiating was what cost us the game, we nearly won and we would have basked in your agony had we done so. But that was honestly the worst officiating I've ever seen. You're a terrible person and I hope the NCAA makes you exit stage left. I think your best bet is for your own safety never call another Kentucky game again. Don't piss off Kentucky fans. We'll make your life hell like you'll see with your roofing business with these reviews. P.S. You look like Jon Gruden, you'd have done a better job officiating an NFL game than the UK game.

4829-6808-9166.2

I contacted John Higgins about some work I needed on my roof. It was at about 80%, so it wasn't in terrible shape, but it needed a little love.

By the time John Higgins finished the job, only 37.5% of it remained. If I didn't know any better, I would think that his poor performance was because he didn't like me.

Because if he doesn't have a bias and he's that terrible at his job, he probably shouldn't be roofer-reeing.

If you will cheat college kids in a game of basketball you will cheat your roofing clients. Your lack of integrity was viewed by millions. Congratulations on that. You should be investigated and never allowed to ref a sporting event again

John:

You are a disgusting excuse for a sporting official. Your roofing company likely takes money under the table from the mafia in Vegas? It's obvious you don't like our coach and have an inferiority complex of some kind - did he somehow manage to beat a spread you tried to handicap in a prior tournament? How you can sleep at night after robbing some 18 and 19 year old kids of a fair shot to prove themselves as a better basketball team is unbeknownst to me. If your roofing company is anything like your officiating I imagine it is rife with illegal labor, substandard materials, and shady accounting practices. Please do all of the NCAA a favor and resign before you decide to determine the outcome of anymore basketball games in exchange for an under the table profit.

Can't imagine ever hiring this man to roof my house. I just think it's bad form to hire a blind man to work on my roof.

What does John Higgin's roofs and his whistle have in common? They both blow away!

John Higgins smokes mids. And he thinks the earth is flat. And wears jean shorts.

# Really just hate the companies name. It's really not great.

And one from a fake Roy Williams account:

I highly recommend this business. Services rendered exceeded my expectations. John really sealed the deal and it was well worth the money I've invested. I anticipate needing work done again this weekend in Phoenix, and I know John will deliver. Me and my kids could not be more grateful for the job he has done so far.

Okay, but seriously, Big Blue Nation: maybe stop doing this. It's not a good look for us, especially the handful of comments wishing death.

Let's chill just a little bit. You can make fun of him all you want here, and we will.

44.     Commenter # 13 accurately responded,

*flappy* March 28, 2017 at 10:49 am | Permalink

This post is disgraceful, and KSR should delete it. This is incitement, and extremely unprofessional by any standard of journalism. With large audiences come large responsibilities.

45.     KSR did not heed the advice of Commenter # 13.  The post is still online as of the

date this complaint is filed, as are all other quotes from the KSR website.

46.     On the KSR Show that morning, Tuesday, March 28, 2017, after a brief

discussion of a new recruit, Mr. Jones started right in on discussing Weatherguard's Facebook

page, which was "much more important," building on Mr. Franklin's publication of comments

on the Facebook page just minutes before the Show started.  Mr. Jones cleverly said from the

outset that he did not "advocate" such activity, but "it doesn't mean it's not funny."  Referring to

Mr. Higgins as the "referee that was terrible in the Game," Mr. Jones went on to claim that the UK fans who wrote on the Facebook page were "not prompted by me" and "you cannot blame this on KSR. . . . Well, maybe you can because I told you he was a roofer." Nevertheless, he went on to name the Facebook page, again, "Rooferees," stating that out of 450 reviews on the Facebook page, 423 were one-star reviews.

47.     Not ready to leave it at that, for an activity Mr. Jones claimed he did not "advocate," Mr. Jones then went on to read and therefore publish several of the defamatory Facebook page comments, "Roofing Reviews from Kentucky Fans," as Mr. Jones called them, as follows:

a.   "I wouldn't trust this man to do any roof, gutters, or to ref a basketball game. He is as crooked as I've ever seen. . . . You're a crooked ref, and if your work as a contractor is anything like your work as a ref, I wouldn't trust you putting a plastic roof on my niece's dollhouse. [Laughter]"

b.   "Had this guy do my roofing. He came home from work, and he was getting it on with my wife. And he also stole my dog. I hate him. [Laughter]"

c.   "John personally came out to fix my roof. I'll say this guy was very professional. He clogged my toilet and didn't tell anyone. I tried to get him to come back and finish my roof and he came back the next day showing up three hours late, smelling of tequila and strippers. His attire for the day was glitter and a tank top. I personally have never dealt with such a simple-minded person. When my roof was finally fixed he overcharged me and even tried to put on his tequila and stripper bill on my bill. [Laughter]"

48.     In other words, while Mr. Jones claimed he did not "advocate" such activity, any fan who wrote such a comment, outrageous enough, would be rewarded by having the comment read on the KSR Show with laughter and admiration, which apparently is no small trophy in "Big Blue Nation."  Mr. Jones stated, "I give them credit.  How many of those would like to potentially write for KSR?"

49.     Mr. Jones spoke approvingly of fans leaving the Facebook comments, saying it was appropriate for fans to leave comments on the roofing/Weatherguard Facebook page, as follows:  "What if [Mr. Higgins] doesn't have a referee page? . . . I think fans feel like this is the only way they can express their frustration."  Again, speaking out of both sides of his mouth, Mr. Jones claimed that such comments were a "bad idea, . . . but it is funny."

50.     After the commercial break, as if to show that the KSR listeners were responding to Mr. Jones' delight in the comments on Weatherguard's Facebook page by adding more reviews, Mr. Jones stated, "I can't stop reading these John Higgins reviews" and noted that now there were 602 reviews, up from the 450 Mr. Jones claimed ten minutes before.  Mr. Jones stated, "It looks like ten of them are five stars, and all the rest of them are one star.  [Laughter]."  Mr. Jones then read and published more of the Facebook comments:

 a.   "If you're unfair in a simple game of basketball, why in the world would I trust you to be fair in my home?  If your roofing skills are like your refereeing, who wants you?"

 b.   "John is so dumb he couldn't pour urine from a boot if the instructions are written on the heel.  [Laughter]"

51.     Again, Mr. Jones conveyed an understanding, approving, and encouraging attitude to the Facebook comments, stating, "[The Kentucky fans] are so upset about this game

16

and they don't know another way to express it to him because they don't have a method to express, 'We are outraged,' and [posting comments on Facebook] has allowed them a way to do it."   Mr. Jones stated "it's human nature" to express oneself by leaving such defamatory comments on Facebook.

52.    Mr. Jones stated that Mr. Higgins "opens himself up" to such comments by referring to his referee career on the Facebook page.   "He doesn't [have to] name it Rooferees. [Laughter]."

53.    Mr. Jones also stated that fans had called or tweeted saying they had called Mr. Higgins' roofing company, virtually inviting other fans to do the same, stating, "it is funny," while literally advising not to call.

54.    Mr. Jones and his sidekick referred to Mr. Higgins throughout the two-hour Show, questioning whether Mr. Higgins was gambling on the Game and, therefore, whether or not Mr. Higgins purposely threw the game to North Carolina.

55.    After the March 28 Show, Commenter # 16 to the "Talkin' Higgins" article accurately commented on Mr. Jones' promotion of the Facebook comments, saying,

> *ukjaybrat* March 28, 2017 at 12:18 pm | Permalink
> it looks like everything mentioning higgins business was removed. i wonder if someone yelled at KSR for promoting the attack on his fb page ?

56.    Just a bit later, Drew Franklin posted an article called, "Call John Higgins' business and you get the FBI (or someone pretending to be the FBI)." http://kentuckysportsradio.com/basketball-2/call-john-higgins-business-and-you-get-the-fbi/.

57.    One "BBN" (Big Blue Nation) commenter cheerfully suggested,

> *madarchitect* March 28, 2017 at 12:54 pm | Permalink
> Maybe BBN should stop with the death threats but continue to call and tell him he sucks as a referee?!

**Harm Suffered by the Higgins Family and Weatherguard Proximately Caused By Defendant's Actions**

58.     After Defendants' publication of Mr. Higgins' business and contact information, as well as their encouragement and enticement to thousands of people to utilize the contact information, Weatherguard received over 3,000 phone calls during the two days after the Game, of which approximately 75% were from Kentucky area codes.

59.     Weatherguard's three telephone lines rang off the hook, literally—the phones did not stop ringing.   Some people called 40 or 50 times a day.   The calls went to electronic voicemail, but because there were so many, the electronic voicemail system crashed.     The unwanted, harassing phone calls decreased when Weatherguard blocked calls from Kentucky area codes.

60.     Because of the non-stop harassing calls, Weatherguard's bona fide customers and prospective customers could not get through to the business, resulting in loss of business and income for Weatherguard.   This continued for up to two weeks.

61.     Prior to these events, Weatherguard had enjoyed being the top-rated roofing company on Google in the Omaha area.   But as a result of Defendants' actions, in a matter of 48 hours, Weatherguard was soon the last-rated business.   Weatherguard was inundated with false, negative, one-star-out-of-five reviews, causing Weatherguard's Google star rating to dramatically decrease, from 4.8 to 1.2, effectively the worst rating a business could have—one star out of five.   Eighty one-star ratings came in over a 24-hour period, none from the Omaha area, and most from Kentucky.   Ultimately, 181 false reviews were made.   This directly impacted Weatherguard's business, because Google lists businesses through its search parameters, in part, based upon the one-to-five star rating; those with top rating get top billing.

18

62.     After Defendants' publication of Mr. Higgins' business and contact information, as well as their encouragement and enticement to thousands of people to utilize the contact information, false reports were filed against Weatherguard at the Better Business Bureau by fake names such as "Calipari John," a reversal of Coach Calipari's name, and "Adolph Rupp," a former Kentucky basketball coach.

63.     After Defendants' publication of Mr. Higgins' business and contact information, as well as their encouragement and enticement to thousands of people to utilize the contact information, Weatherguard's Facebook page received so many false posts—700 of them—that Weatherguard was forced to take the Facebook page down, which removed an important part of Weatherguard's advertising and marketing efforts (see Facebook posts published by KSR, above).  This also removed one of the major ways in which bona fide customers searched for Weatherguard's contact information (although such a customer would not have gotten through the filled phone lines in any event).

64.     On March 27-28, 2017, Ms. Higgins received two messages from persons unknown to her on the Facebook Messenger account.  One simply provided a link to the KSR webpage.  The other stated, "Your husband is a piece of trash."

4829-6808-9166.2



65.     As the days of harassment went on, other problems appeared.  After Defendants'

publication of Mr. Higgins' business and contact information, as well as their encouragement

and enticement to thousands of people to utilize the contact information, Weatherguard's contact

information was entered into other legitimate business's websites, asking for information from

real estate agents, car dealerships, and the like.  As a result, Weatherguard's phone lines were

now inundated with follow-up calls from these legitimate businesses.  Weatherguard's business

manager's email, available on the Weatherguard website, was given to more than forty car

dealers through cars.com and autotrader.com and the like, who wrote to ask when the business

manager was going to come test-drive the cars he had (not) inquired about.

4829-6808-9166.2

66.    In addition, as the result of Defendants' publication of Mr. Higgins' business and contact information, as well as their encouragement and enticement to thousands of people to utilize the contact information, Weatherguard received numerous fake calls complaining of leaking roofs—during a very rainy season in Eastern Nebraska, as it happens—so that Weatherguard employees wasted time following up on the calls, which were usually from addresses that did not exist, after the employees researched the matter.  So at that point, when a real customer called, the employees did not know if it was a real or bogus call.

67.    As a result of the disruption of Weatherguard's phone lines, email, and internet presence, Weatherguard lost business opportunities.  Weatherguard lost bids and jobs because it could not receive information from prospective customers regarding deadlines and follow-ups.

68.    After Defendants' publication of Mr. Higgins' business and contact information, as well as their encouragement and enticement to thousands of people to utilize the contact information, Mr. Higgins began receiving death threats in voice messages to his home—even though it had an unlisted number—and at Weatherguard.   The death threats and threats of physical harm included the following, available for listening at http://www.wowt.com/video?vid=426051243:

    a.   "You should put a gun in your mouth and blow your own frickin' brains out."

    b.   "You're gonna pay, buddy."

    c.   "You enjoy your life before somebody kills you."

    d.   "You hear that garbage truck in the background over there?  Wish you were in it personally."

    e.   "[I hope he falls off a roof] and spends the rest of his life in a wheelchair."

69. Weatherguard's employees found the violent phone calls, fake Google reviews, and fake Facebook postings to be frightening.

70. Even Mr. Higgins's family members received death threats, placed on the private home telephone line published by Defendants.

71. As the result of the death threats and threats of bodily harm, Mr. and Ms. Higgins's school-age son feared that his father would be killed.

72. As the result of the death threats and threats of bodily harm, Mr. and Ms. Higgins's son's school-age friends feared that their friend's father would be killed.

73. As a result of the death threats and threats of bodily harm, the Sarpy County Sheriff added patrols around Weatherguard's place of business. In addition, the Omaha Police Department added patrols around the Higginses' residence.

74. As a result of the death threats and threats of bodily harm, the Higginses were forced to cancel their home telephone service.

75. Two days after the Game, on Tuesday, March 28, 2017, Mr. Higgins contacted law enforcement, namely, the Sarpy County Sheriff. Mr. Higgins and Trent Lovewell, Weatherguard's business manager, met with Investigator Matthew Barrall of the Sarpy County Sheriff's office at the Weatherguard place of business. Investigator Barrall was there for 90 minutes and reported that the phone did not stop ringing during that time.

76. Mr. Lovewell eventually turned over 800 threatening, vulgar, or harassing voicemail messages received on the Weatherguard phone line to Investigator Barrall. Ms. Higgins turned over 30 such threatening, vulgar, or harassing messages received on the Higgins family home phone line. Investigator Barrall found that out of these hundreds of threatening,

4829-6808-9166.2

vulgar, and harassing emails, a full *dozen* rose to the level of an *actual threat* of death or bodily injury that he would *pursue as a criminal investigation*.

77.     As the result of Defendants' actions, Mr. Higgins, Ms. Higgins, and their family suffered fear for their lives.  The Higginses' adult son and Weatherguard employee saw his own name on blogs attacking his father.

78.     As the result of Defendants' actions, Weatherguard employees also suffered fear for their lives.  Mr. and Ms. Higgins were obliged to advise their employees not to come into work for several days during the most intense part of the onslaught.

79.     As the result of Defendants' actions, Weatherguard suffered serious business losses due to the extreme disruption of the business and the inability to communicate with customers and potential customers and the inability to advertise and market the business.

80.     Defendants' intentional and outrageous course of conduct caused Plaintiffs to seek expert information technology, investigative, cyber-security, advertising, marketing, counseling, and legal assistance and advice from outside resources, at great expense to Plaintiffs.

81.     Defendants' intentional and outrageous course of conduct was intimidating, harassing, threatening, and so extreme as to have caused Mr. and Ms. Higgins and their family to feel restrained and unable to focus on their extensive business responsibilities, their personal lives, and their professional associations.

82.     Defendants' intentional and outrageous course of conduct caused Mr. and Ms. Higgins and their family personal and professional anxiety, fear, harassment, and intimidation.

83.     Defendants' intentional and outrageous course of conduct caused Plaintiffs to suffer from lack of sleep due to fear for their lives.

84.     Defendants' intentional and outrageous course of conduct caused Plaintiffs to expend considerable sums of money to protect themselves from further damage.

85.     At the Final Four NCAA basketball game that Mr. Higgins bravely officiated just a week after the Game, the Higgins family was obliged to be protected by a bodyguard.  From the moment the Higgins family got off the plane, they were greeted by their bodyguard and were protected 24/7 during their stay at the Final Four.

86.     On August 1-2, 2017, the National Association of Sports Officials ("NASO") held a meeting in Louisville, Kentucky.  The NASO had intended to honor Mr. Higgins at the meeting by bestowing upon him the Great Call Award, intended to honor Mr. Higgins's professionalism under extremely difficult circumstances.  The organizers of the meeting met to discuss security issues surrounding the threats made against Mr. Higgins and ultimately advised Mr. Higgins not to travel to Kentucky due to lack of security at the event.  NASO officials are planning to travel to Omaha to present the award to Mr. Higgins in person.

87.     Mr. Jones stated on the air that he "hated" Mr. Higgins.  Mr. Jones and the other Defendants expressed that hatred by acting to shut down Mr. Higgins's business and terrify his family, all the while claiming that they would never do such a thing.

88.     Defendants' intentional, outrageous, ongoing course of conduct caused Plaintiffs to suffer damages in an amount to be determined at trial, but that in any event exceed $75,000.

## COUNT I
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

89.     Plaintiffs repeat and re-allege each of the allegations in the preceding paragraphs previously pled as if each were set forth in full herein.

90.     Defendants' intentional, or at least reckless conduct described herein is so outrageous in character and extreme in degree as to go beyond all possible bounds of decency.

4829-6808-9166.2

91.     Defendants' intentional, or at least reckless conduct described herein is to be regarded as atrocious and utterly intolerable in a civilized community.

92.     Defendants' intentional, or at least reckless conduct described herein caused Mr. and Ms. Higgins emotional distress so severe that no reasonable person should be expected to endure it.

93.     Defendants' intentional, or at least reckless conduct alleged herein constitutes the Intentional Infliction of Emotional Distress under the laws of Nebraska.

94.     Defendants' intentional, or at least reckless conduct described herein is a proximate cause of general and special damages to Plaintiffs, as described above, in an amount to be determined at trial.

## COUNT II
## INVASION OF PRIVACY

95.     Plaintiffs repeat and re-allege each of the allegations in the preceding paragraphs previously pled as if each were set forth in full herein.

96.     Defendants' conduct described herein has intruded upon Mr. and Ms. Higgins, natural persons, in their place of solitude or seclusion.

97.     Defendants' intrusion would be highly offensive to a reasonable person.

98.     Defendants' intrusion described herein violates Nebraska statutory law (Neb. Rev. Stat. § 20-203) and common law.

99.     Defendants' intrusion described herein is a proximate cause of general and special damages to Plaintiffs, as described above, in an amount to be determined at trial.

4829-6808-9166.2

## COUNT III
## TORTIOUS INTERFERENCE WITH A
## BUSINESS RELATIONSHIP OR EXPECTANCY

100.     Plaintiffs repeat and re-allege each of the allegations in the preceding paragraphs previously pled as if each were set forth in full herein.

101.     Prior to the Defendants' conduct described herein, Plaintiffs, and, in particular, Weatherguard, had a business relationship or expectancy with hundreds, if not thousands, of customers and potential customers, illustrated by its strong business presence in the Omaha metropolitan area, legions of satisfied customers, ongoing requests for quotes for new projects, near-perfect Google rating, A+ rating from the Better Business Bureau, and continued financial success.

102.     Defendants were aware of Mr. Higgins' business, Weatherguard, and of Mr. Higgins' profession as a roofing contractor.

103.     Defendants intentionally and unjustifiably interfered with Mr. Higgins' business, Weatherguard, by the actions cited above.

104.     Defendants' tortious interference with Weatherguard's business described herein was a proximate cause of damage to Plaintiffs, as described above, in an amount to be determined at trial.

## COUNT IV
## CIVIL CONSPIRACY

105.     Plaintiffs repeat and re-allege each of the allegations in the preceding paragraphs previously pled as if each were set forth in full herein.

106.     Defendants, both among themselves and along with other persons, accomplished by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means.

4829-6808-9166.2

107.    Specifically, Defendants entered into at least an implied agreement, if not an expressed agreement, both among themselves and with KSR listeners and KSR website viewers, in order to inflict emotional distress upon, harass, invade the privacy of, defame, and tortuously interfere with the business relationship or expectancy of Plaintiffs.

108.    As a result of the wrongful acts among Defendants and among Defendants and other persons, Plaintiffs have suffered damages as described above, in an amount to be determined at trial.

## JURY DEMAND

Plaintiffs make a jury demand consistent with Federal Rule of Civil Procedure 38.

## REQUEST FOR PLACE OF TRIAL

Pursuant to Nebraska Civil Rule 40.1(b), Plaintiffs request the jury trial to take place in Omaha, Nebraska.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants on Counts I through IV above granting the following relief:

A.    Permanent injunctive relief that prohibits Defendants from engaging in the conduct complained of herein;

B.    An award of damages in an amount to be determined at trial;

C.    An award of prejudgment and post-judgment interest, as allowed by law;

D.    An award of costs and attorney fees; and

E.    Such further relief as this Court deems just and proper.

4829-6808-9166.2

Dated this 3rd day of October, 2017.

JOHN M. HIGGINS, CAROL HIGGINS, and
WEATHERGUARD, INC,
Plaintiffs


By: */s/ John P. Passarelli*

John P. Passarelli #16018
Carol A. Svolos #24731
Kutak Rock LLP
The Omaha Building
1650 Farnam Street
Omaha, NE  68102-2186
(402) 346-6000
john.passarelli@kutakrock.com

Kimberly M. Hare #25181
Kutak Rock LLP
One South Wacker Drive
Suite 2050
Chicago, IL 60606-4614
(312) 602-4100
kimberly.hare@kutakrock.com

4829-6808-9166.2